UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLAUDIA MANLEY and NOEL MANLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 15 C 07499 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| BRUCE LAW and HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT 86, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claudia and Noel Manley believe that Hinsdale Township High School District 86 and Bruce Law, the District's Superintendent, subjected Claudia to a "vigilante" campaign when they investigated complaints that Claudia—a member of the District's School Board—inappropriately confronted two individuals on school property. (For convenience, the Opinion will refer to the Defendants collectively as "the District.") After launching a grievance procedure to address the complaints, the Manleys filed a state-court suit, unsuccessfully seeking a temporary restraining order against the investigation. The District eventually concluded that Claudia was "mean spirited and rude" during the confrontation, but took no other formal action against her. After the Manleys amended the state-court complaint to refer to 42 U.S.C. § 1983, the District removed the case to federal court. The Manleys allege that the grievance procedure violated their procedural due process rights, and also assert two state-law declaratory judgment claims asking the Court to interpret two

School Board policies.[1] Both parties then moved for summary judgment. For the reasons explained below, the Manleys' motion is denied as to the § 1983 claims, and the District's cross-motion is granted on those claims. With the federal claims out of the case, the Court relinquishes jurisdiction over the state-law claims and remands the case to the DuPage County Circuit Court.

## I. Background

Both parties have moved for summary judgment, so in evaluating the Manleys' motion the Court must draw reasonable inferences in the District's favor, and vice versa on the District's motion. But the relevant facts are largely undisputed. Claudia and Noel Manley are a married couple residing in Darien, Illinois. PSOF ¶ 3; R. 8, Defs.' Answer ¶¶ 1-2.[2] At all relevant times, Claudia was (and still is) a member of the Hinsdale Township High School District 86 Board of Education, which is an elected office; she also served as chairperson of the Board's policy committee until May 4, 2015. PSOF ¶¶ 2, 6; Defs.' Answer ¶¶ 1, 5. On the evening of March 12, 2015, two individuals—one high school student and one

---

[1]The Court has subject matter jurisdiction over the federal civil-rights claims under 28 U.S.C. § 1332. The Court has supplemental jurisdiction over the state-law declaratory judgment claims under 28 U.S.C. § 1367(a), because they form part of the same case or controversy as the federal claim.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Citations to the parties' Local Rule 56.1 Statements of Fact are "PSOF" (for the Manleys' Statement of Facts) [R. 24]; "Defs.' Resp. PSOF" (for the District's Response to the Manleys' Statement of Facts) [R. 36]; "DSOAF" (for the District's Statement of Additional Facts) [R. 36 at 23]; "Pls.' Resp. DSOAF" (for the Manleys' Response to the District's Statement of Additional Facts") [R. 37 at 6]; "Pls.' Reply PSOF" (for the Manleys' Reply to the District's Response to their Statement of Facts) [R. 37 at 2]; "PSOAF" (for the Manleys' Statement of Additional Facts) [R. 37 at 10]; "Defs.' Resp. PSOAF" (for the District's Response to the Manleys' Statement of Additional Facts) [R. 39].

Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

2

adult—were distributing fliers for a slate of candidates running for the upcoming Board election. PSOF ¶ 8; Defs.' Answer ¶ 7. The two stood outside the entrance of Hinsdale South High School and gave fliers to people entering the building. *Id.* That evening, the Manleys went to the high school to see the spring play; as they approached the building, Claudia confronted the leafleters, challenging their right to distribute campaign literature on District property. PSOF ¶¶ 9-11; Defs.' Answer ¶¶ 8-10; R. 36-8, Defs.' Exh. 8, 5/4/15 Circuit Court Op. at 2. In particular, Board Policy 4:20 prohibits the on-campus distribution of "[a]dvertisements that promote … political organizations" and "[c]ampaign materials from candidates and political parties." R. 36-10, Defs.' Exh. 10, Board Policy 4:20 ¶ 2(f)-(g). The details of the ensuing confrontation are disputed, but they are not relevant for the summary judgment motions at hand. What is undisputed is that the encounter lasted around six to seven minutes and was captured on the District's security camera. PSOF ¶¶ 11-12; R. 36-3, Defs.' Exh. 3, Litman Report at 15. The video shows the student moving in and out of the conversation; at one point, she faced Claudia and made a gesture with her hands. PSOF ¶ 13. Claudia turned toward the student and responded, and after a short exchange, the student walked away. *Id.* After the student left, the adult leafleter spoke with the Manleys before leaving. *Id.* ¶ 15.

The March 12 incident quickly gained a lot of publicity; for example, a petition demanding Claudia's resignation from the School Board circulated online, and several newspapers reported on the incident. PSOF ¶ 22; R. 24-1, Pls.' Exh. A to Davidson Aff., 4/6/15 Chicago Tribune Article; R. 24-1, Pls.' Exh. B to Davidson Aff.,

3

Online Posting; R. 24-1, Pls.' Exh. D to Davidson Aff., 7/21/15 Chicago Tribune Article; R. 24-2, Pls.' Exh. A to C. Manley Aff., 3/15/15 Dupont Email; R. 24-2, Pls.' Exh. A-1 to C. Manley Aff., 3/15/15 Gallo Email. A number of individuals also complained to the District about the incident. PSOF ¶ 30; Defs.' Answer ¶ 13. In response, the District initiated the Uniform Grievance Procedure outlined in Board Policy 2:260, which governs the process when "[s]tudents, parents/guardians, employees, or community members … believe that the Board of Education, its employees, or agents have violated their rights," or if an aggrieved party otherwise has a complaint about a list of enumerated issues. *Id.*; R. 36-9, Defs.' Exh. 9, Board Policy 2:260.

Bruce Law, the District Superintendent, appointed Jeffrey Litman as a "complaint manager" or "independent reviewer" to supervise Claudia's grievance process; Litman had previously worked as a hearing officer for the District. PSOF ¶¶ 31-32; R. 36-12, Defs.' Exh. 12, 3/17/15 Law Email. The School Board was scheduled to discuss the investigation during a meeting on April 27, 2015, but the Board could not take action because there was no quorum. PSOF ¶ 37; Defs.' Answer ¶ 58. Three days later, the Manleys filed an action in the Circuit Court of DuPage County, seeking a temporary restraining order to prevent the Board from continuing the grievance procedures against Claudia. PSOF ¶ 38; R. 1-2, Compl.; 5/4/15 Circuit Court Op. The Manleys argued that Board Policy 2:260 was inapplicable to Claudia, and that subjecting her to the grievance process would violate her rights and cause immediate and irreparable harm to the Manleys'

4

reputation, mental health, and personal well-being. 5/4/15 Circuit Court Op. at 2. The Circuit Court denied the TRO, explaining that the Manleys did not establish a certain and clearly ascertainable right (state-law terminology for the TRO standard) and also "fail[ed] to establish how being subjected to the District's uniform grievance procedure would certainly and clearly constitute intimidation, harassment, bullying, or defamation." *Id.* at 2. There was no irreparable harm because the procedures had not yet started and no findings had been made; further, the Manleys failed to explain why Claudia should not be subjected to Board Policy 2:260, which "appears well suited to address community concerns regarding Board members." *Id.* at 3-4. The Circuit Court closed by "not[ing] its concern" with two issues; one was Claudia's "attempt[s] to enforce Board policy [4:20] without authority" on the evening of March 12. *Id.* at 4. The second concern was the legitimacy of Board Policy 4:20, which "may constitute prior restraint of free speech" in its prohibition of political and campaign materials on campus. *Id.* at 5. But the Circuit Court "reserve[d] any further comment" on these issues pending additional briefing. *Id.*

A few days after the Circuit Court denied the TRO, Litman's investigation continued. PSOF ¶ 39; Defs.' Answer ¶¶ 22-23. On May 12, 2015, Litman completed a 16-page report, concluding that "there was not enough time [during the March 12 encounter] for Mrs. Manley's remarks to rise to the level that would establish a pattern of harassment or bullying" against the student leafleter, but that Claudia's comments were nonetheless "mean-spirited and rude." PSOF ¶ 46; Litman Report

5

at 15-16. Litman also concluded that Claudia had violated District Policy 8:30, which requires "mutual respect, civility and orderly conduct among all individuals on school property or at a school event." Litman Report at 16 (quotation marks omitted); R. 36-11, Defs.' Exh. 11, Board Policy 8:30 at 1.

On May 18, 2015, the Board held an open meeting to appoint a "[Uniform Grievance Procedure] Investigative Committee," which consisted of the full Board except for Claudia, and then held a closed session to approve the Litman Report. PSOF ¶¶ 49-50; Defs.' Answer ¶ 35. Later that evening, the full Board—including Claudia—reconvened in an open session and voted 4-2 to adopt the Litman Report with minor changes. R. 36-4, Defs.' Exh. 4, 5/18/15 Committee Recommendation; R. 36-2, Defs.' Exh. 2, Law Aff. ¶ 3; Defs.' Answer ¶¶ 37-38. A little less than a month later, on June 9, 2015, the Board sent Claudia a letter formalizing its conclusions—namely, that on March 12, Claudia had "over-stepped [her] authority" by confronting the leafleters about a perceived Board Policy violation, because individual board members "do not have the authority to police behaviors on campus," but "have authority only at a publically-noticed open meeting during a vote." PSOF ¶ 58; R. 36-5, Defs.' Exh. 5, 6/9/15 Board Letter. The Board explained that although Claudia did not bully or harass the leafleters, her comments were "mean-spirited and rude," so she had violated District Policy 8:30 requiring respect and civility on school property. 6/9/15 Board Letter. After issuing the letter, the Board closed its investigation of the March 12 incident. Law Aff. ¶¶ 4-5.

On July 27, 2015, the Manleys filed an amended complaint in the state-court action. R. 1-2, Am. Compl. The amended complaint contained two counts for declaratory relief; the first requested the state court to hold "that Board Policy 2:260 is invalid and unenforceable as applied" to Claudia, allegedly because it does not cover complaints against Board members. *Id.* ¶¶ 51-60. In the second count, the Manleys also sought a declaration that "Board Policy 4:20 clearly prohibits distribution of political campaign materials on district property." *Id.* ¶¶ 60-66. The Manleys also alleged, without listing a separate count, that Board Policy 2:260 did not safeguard Claudia's procedural rights because she did not have full hearing rights, including the ability to object to evidence, present and confront witnesses, and have an impartial arbiter, among other rights, *id.* ¶ 55, and requested damages under 42 U.S.C. § 1983, *id.* at 21.

On August 26, 2015, the District removed the action to this Court. R. 1, Notice of Removal. After failed settlement negotiations, and after the Court ensured that the parties had conducted all the discovery they wanted, the Manleys moved for summary judgment, R. 23, against which the District cross-moved, R. 34.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). As noted above, both parties moved for summary judgment in this case, so in evaluating the Manleys' motion the Court must draw reasonable inferences in the District's favor, and vice-versa on the District's motion. The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that she is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

#### A. Federal Due Process Claim

##### 1. Claudia Manley

The Court will first address the § 1983 claim as to Claudia Manley, who asserts a Fourteenth Amendment due process violation.[3] The Fourteenth

---

[3]The Manleys' amended complaint explicitly references § 1983 only once, alleging that "[d]amages might, for example, be awarded pursuant to the remedies provided by 42 U.S.C. § 1983 … ." Am. Compl. at 21. But the Manleys consistently highlight the lack of appropriate procedures during the grievance process. *See* Am. Compl. ¶ 55 ("Policy 2:260 is

8

Amendment prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend XIV, § 1. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations and quotation marks omitted). Evaluating procedural due process claims entails "a two-step process: [t]he first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002) (citation and quotation marks omitted).

Claudia immediately runs into a problem at step one of the inquiry. She has not alleged or explained, much less offered evidence at this summary judgment stage, that she has been deprived of any constitutionally protected liberty or property interest. It is undisputed that at the end of the District's investigation, the only tangible consequence Claudia suffered was the receipt of a letter stating that she had "over-stepped [her] authority" by confronting the leafleters about a perceived Board Policy violation, because individual board members "do not have the authority to police behaviors on campus," but "have authority only at a publically-noticed open meeting during a vote." 6/9/15 Board Letter. The Board also

---

devoid of safeguards of a party's procedural rights, such as (but not limited to): (i) right to an impartial arbiter … ,(ii) right to be advised of the nature of the complaint, or even the identity of the complainant; (iii) right to respond to the complaint, (iv) right to discover the evidence being introduced or considered, (v) right to object to evidence, (vi) right to confront witnesses, (vii) right to appeal, etc."); R. 25, Pls.' Br. at 6 (arguing that "Defendants … denied plaintiffs[] due process rights in its application" of District Policy 2:260); *id.* at 9-11 (making procedural due process arguments). And the defense does not dispute that the Manleys are asserting a procedural due process violation under § 1983.

9

concluded that Claudia had violated Board Policy 8:30, which requires "mutual respect, civility and orderly conduct among all individuals on school property or at a school event," because she "did not demonstrate respect or civility in [her] interactions with [the two leafleters]." *Id.* (citing Policy 8:30 at 1). But no legal interest of Claudia's was harmed as a result of this reprimand; she did not lose her seat on the Board, was not suspended, and did not lose any privileges of her office. Claudia fails to explain why the receipt of this letter implicated any constitutionally-protected interest, whether liberty or property.

Claudia does allege, however, that the District participated in "a campaign of character assassination" that was "injurious to [her] reputation and well-being." Am. Compl. ¶ 17. As proof, Claudia submits articles and online postings about the March 12 incident, as well as emails from the community calling for her resignation from the Board. *See* 4/6/15 Chicago Tribune Article; Online Posting; 7/21/15 Chicago Tribune Article; 3/15/15 Dupont Email; 3/15/15 Gallo Email. But that is not enough to transmogrify the situation into a *federal constitutional* due process claim. No protected liberty interest is at stake; the Supreme Court has held that "interest in reputation alone" is not cognizable under the Due Process Clause. *Paul v. Davis*, 424 U.S. 693, 711-12 (1976). This is true "even when [defamation by the government] causes serious impairment of one's future employment," *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (citation and quotation marks omitted), which did not even happen in Claudia's case. To assert a liberty interest based on reputational loss, a plaintiff must show "stigma plus," or "the alteration of legal

status such as government deprivation of a right previously held, which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Id.* at 768. (citations and quotation marks omitted). For example, in cases where the Department of Child and Family Services placed an "indication" of child abuse and neglect in child care workers' records, which were located on a central registry, the state altered the workers' legal status and affected their liberty interest in pursuing their occupation. *See Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005); *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002). On the other hand, "[d]efamation alone, even if it renders it virtually impossible for the [plaintiff] to find new employment in his chosen field … is not enough to invoke the procedural safeguards of the Fourteenth Amendment." *Hinkle*, 793 F.3d at 770 (citation and quotations marks omitted) (no liberty interest implicated when a state police investigator spread rumors that plaintiff was an arsonist and a child molester, even when plaintiff was not able to get a job in law enforcement afterward); *see also, e.g.*, *Doyle*, 305 F.3d at 614 ("[W]hen a state actor makes allegations that merely damage a person's reputation, no federally protected liberty interest has been implicated." (citations omitted)). In this case, the District did nothing to affect Claudia's *legal* status, and no source of law "extends to [Claudia] any legal guarantee of present enjoyment of reputation … ." *Paul*, 424 U.S. at 711.

Nor has Claudia established the denial of any property interest, which exists when there is "a legitimate claim of entitlement" to a benefit. *Bd. of Regents v. Roth*,

11

408 U.S. 564, 577 (1972). This interest comes from an "independent source such as state law," or "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* For example, state law could establish a property interest in continued public employment. *Id.* Here again, Claudia has not articulated or attempted to prove any property interest, although the District agrees that Claudia has a legitimate claim of entitlement to her current term on the School Board. R. 35, Defs.' Br. at 5 (citing 105 ILCS 5/9-5, 10-10 (term of office); 105 ILCS 5/10-11 (identifying limited circumstances that disqualify sitting Board member from office); *E. St. Louis Fed'n of Teachers v. E. St. Louis Sch. Dist. No. 189 Fin. Oversight Panel*, 178 Ill. 2d 399, 417-18 (1997) (school board members had protected property interests in seats on board)). But Claudia does not come close to showing that she has been *denied* this property interest; as explained above, she received only a letter of reprimand that carried no legal consequences against her Board position. She was not removed or suspended, nor did she lose any privileges of her position. And as the case with liberty interests, "[p]urely dignitary and non-pecuniary interests, such as professional satisfaction, personal relationships, and reputation, do not constitute property" interests and are not actionable under the Due Process Clause. *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) (citation omitted).

In sum, because the undisputed facts show that Claudia was not denied any protected liberty or property interest, her § 1983 claim fails.

## 2. Noel Manley

Noel Manley, Claudia's husband, asserts the same procedural due process claim under § 1983. But for the same reasons explained above for Claudia, Noel's claims must be rejected as well, because there is even *less* of an argument that he has been deprived of a protected interest. Like Claudia, Noel also claims "injury to [his] reputation and well-being," Am. Compl. ¶ 17, but nowhere in the record is there any elaboration or proof of an injury to *his*, as opposed to Claudia's, reputation. But even had Noel shown reputational harm, he could not establish a liberty interest. Noel was not subject to any community complaints or grievance procedures, and he did not even come close to suffering an alteration of his legal status. Nor has Noel established any property interest, much less the deprivation of one, because he does not serve on the Board or claim entitlement to any other public benefit. What's more, even if *Claudia* had suffered any legally protected deprivation (which she did not), Noel has cited no cases suggesting that *he* was entitled to procedural due process during her grievance investigation solely because of his status as her spouse. *See Toronyi v. Barrington Cmty. Unit Sch. Dist. 220*, 2005 WL 388568, at *4 (N.D. Ill. Feb. 10, 2005) (explaining that "[wife's] retaliatory discharge and due process claims must fail because she has no standing to challenge her husband's termination"). So again, no reasonable jury could find that Noel suffered some stigma-plus to establish liberty interest, or the loss of a benefit to establish property interest.[4][5]

---

[4]Another deficiency with the Manleys' § 1983 claims is that they fail to allege, much less prove, municipal liability against the District. To establish municipal liability—that is,

13

For similar reasons, the Court agrees with the District that Noel lacks standing to bring his § 1983 claim. Standing requires that a plaintiff establish, for each claim, "(1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 527 (7th Cir. 2001) (citations omitted). But because Noel fails at step one—the District did not deprive him of any legally protected interest—

---

a government policy or custom that violates a plaintiff's rights—a plaintiff must show "an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999) (citation omitted). But the Manleys do not attempt to explain why one of those three theories applies.

[5]Although the Manleys' amended complaint did not expressly invoke a First Amendment claim, their summary judgment briefing makes passing references to free speech without explaining how the District violated their First Amendment rights. *E.g.*, R. 25, Pls.' Br. at 3 ("[Plaintiffs] were engaged in protected First Amendment speech on March 12th" and "it is the constitutional right of any citizen reasonably to confront a wrongdoer with a truthful reference to governing authority"); R. 38, Pls.' Reply at 3 ("[W]ell within the bounds of permissible First Amendment principles, [the Manleys] challenged the offenders."); *id.* at 4 ("[T]he Board Majority's actions in this matter is part of a systemic effort to chill the [Manleys'] First Amendment rights of Speech and Association … ."); *id.* at 11 ("Claudia … was exercising her own First Amendment rights on March 12th[.]"). A potential First Amendment theory—which the Manleys do not articulate or develop in the faintest—is that Board Policy 8:30, which requires "mutual respect, civility and orderly conduct among all individuals on school property or at a school event," deters the Manleys from speaking. Another theory—again undeveloped—might have been that the District retaliated against the Manleys for exercising their speech rights. None of the First Amendment theories were developed in any way.

Even if the Manleys had advanced a First Amendment claim, there would have been, at the very least, a serious obstacle because they have not shown that the letter from the Board, which had no particular legal consequence, deterred their speech or punished them for it. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) (alleged conduct must be "likely [to] deter a person of ordinary firmness from continuing to engage in protected activity").

there is also no causation, nor can the Court redress any non-existent injury. *See supra.* The lack of standing, therefore, is an independent reason to reject Noel's § 1983 claim.[6]

### B. State-Law Declaratory Judgment Claims

The Manleys assert two additional state-law declaratory judgment claims. First, they ask the Court to declare that the District improperly subjected Claudia to the Uniform Grievance Procedure in District Policy 2:260, which governs complaints about "the Board of Education, its employees, or agents." Board Policy 2:260; R. 25, Pls.' Br. at 6-14. According to the Manleys, Claudia was not the Board, its employee, or its agent, but rather a member of the community who was not covered by the Policy. *Id.* Second, the Manleys ask for a declaration that "distribution of political campaign materials on school property is a clear violation of District Policy 4:20." Pls.' Br. at 2. In essence, the Manleys want the Court to say that the leafleters violated district policy on the evening of March 12, which in turn implies that Claudia had reason to confront the leafleters.

The Court, however, declines to address these issues and instead relinquishes jurisdiction over the state-law declaratory judgment claims.[7] When the federal claims have dropped out of a litigation, courts have discretion to decide whether to

---

[6]Because the Court has held that the Manleys were not deprived of any substantive right, it need not address the District's argument that Claudia received all of the process that she was due during the grievance procedures, or that Defendant Law is entitled to qualified immunity.

[7]The Manleys have not invoked the Declaratory Judgment Act, 28 U.S.C. § 2201, but even if they had, the "[Act] is not an independent source of federal subject matter jurisdiction," so "the district court must possess an independent basis for jurisdiction." *GNB Battery Techs., Inc. v. Gould, Inc.,* 65 F.3d 615, 619 (7th Cir. 1995) (citing *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671 (1950)).

15

relinquish the remaining state-law claims. *E.g.*, *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012); *Al's Serv. Ctr. v. BP Prod. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims … , which the plaintiff can then prosecute in state court." *Al's Serv. Ctr.*, 599 F.3d at 727 (citations omitted). The presumption in favor of relinquishing jurisdiction "is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *RWJ Mgmt. Co.*, 672 F.3d at 479 (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996); *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989)) (quotation marks omitted). Three factors can "displace the presumption": when "(1) the statute of limitations has run on the [supplemental] claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) [] it is absolutely clear how the [supplemental] claims can be decided." *Id.* (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009)). Courts may also consider goals of "convenience, fairness, and comity." *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

Here, the District argues that the Court should retain jurisdiction for the purposes of judicial economy, because "[t]his case has already consumed too many judicial resources." Defs.' Br. at 14. But the Court has not committed substantial

16

resources on this case to date. Indeed, the Court has not had a significant opportunity to evaluate the case until now, after the summary judgment motions were filed. After the District removed this case in August 2015, R. 1, the parties scheduled a settlement conference for October, R. 16, but later canceled it, R. 19. The District filed no dismissal motion, and the Manleys moved for summary judgment in November, just one month after Rule 26(a)(1) initial disclosures were due. R. 14-15, 23. So the parties exchanged little, if any discovery. As a result, the Court "[is] not so enmeshed in substantive issues of state law that the presumption in favor of remand should be set aside." *RWJ Mgmt. Co.*, 672 F.3d at 480 (relinquishment was proper even after district court had considered 70 motions and issued 45 orders, because only one of the rulings were substantive); *cf. Miller Aviation v. Milwaukee County Board of Supervisors*, 273 F.3d 722 (7th Cir. 2001) (judicial efficiency warranted retaining jurisdiction when the district court already invested 5 years in the litigation, after being involved in 22 motions, 9 hearings, 19 orders, and a substantive 71-page decision, and after significant effort developing a "mastery" of the state-law issues).

The District also argues that the Court should retain jurisdiction because "[t]he resolution of the state law claims is clear, and it would be pointless to burden the state court with them." Defs.' Br. at 14. But the goals of comity and federalism are better served by relinquishing jurisdiction, because the remaining claims are pure issues of state law, and indeed require interpretation of *local* school board policies that have the status of local administrative regulations. *See* 105 ILCS 5/10-

20.5 (school boards have the authority "[t]o adopt and enforce all necessary rules for the management and government of the public schools of their district. Rules adopted by the school board shall be filed for public inspection in the administrative office of the district."); *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998) ("In Illinois, the School District's Board of Education has full power to manage the schools and to adopt all rules and regulations needed for that broad purpose."). The Circuit Court is especially well-positioned to assess the declaratory-judgment claims because it is familiar with local school board policies and the Manleys' claims. Indeed, it has already considered the challenged policies when it issued the May 2015 order denying the Manleys' TRO. *See* 5/4/15 Circuit Court Op. Thus, the presumption of relinquishing jurisdiction is not rebutted in this case.

Finally, to be clear, although the Court previously held that Noel Manley has no standing to bring his federal § 1983 claim, *see supra* Section III.A.2, the Court makes no determination as to standing—for either party—with regards to the declaratory judgment claims. Any procedural or substantive arguments regarding those state-law claims will be decided by the state court.

## IV. Conclusion

For the reasons described above, the Manleys' motion for summary judgment, R. 23, is denied as to the § 1983 claims. The District's cross motion for summary judgment, R. 34, is granted as to the § 1983 claims. The Court makes no decision on

the remaining state-law declaratory judgment claims, and relinquishes jurisdiction over these claims.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 2, 2016